THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PAUL COVITZ *et al.* Plaintiffs in Error.

*Opinion filed February 21, 1914—Rehearing denied April 22, 1914.*

1. CRIMINAL LAW—*what constituted arson at common law.* Arson, at common law, was the willful and malicious burning of the dwelling house, or out-house within the curtilage of a dwelling house, of another person, and it was an offense against the habitation and regarded the possession rather than the property.

2. SAME—*what was required to be alleged in indictment for arson at common law.* An indictment for arson at common law was required to allege the property to be the property of the one in possession, as the burning of the dwelling house was not regarded as an offense against the property and punishment for it was intended to protect the occupant and not the owner.

3. SAME—*the statute relating to arson was intended to protect property and not merely habitation.* Section 13 of division 1 of the Criminal Code, relating to arson, enumerates many buildings, not structures for habitation, the willful and malicious burning of which is defined as arson, and was intended to protect property and not merely habitation.

4. SAME—*section 19 of Criminal Code changes common law rule of pleading as respects arson.* Section 19 of division 1 of the Criminal Code, providing that in an indictment for setting fire to or burning any building it is sufficient to allege, if the building was occupied, that the building was the property of the owner, lessee or occupant thereof, or, if unoccupied, to allege that it was unoccupied, giving a description thereof in general terms, changes the common law rule of pleading as to arson.

5. SAME—*burning any building, the property of another, is arson.* The words "any other building," used in section 13 of division 1 of the Criminal Code, concerning arson, are not limited to buildings of the same class as those specifically enumerated, but include all the buildings specifically enumerated and any other building the property of another.

6. SAME—*when charging offense in language of statute is sufficient.* Under section 6 of division 11 of the Criminal Code an indictment is sufficient which charges an offense in the language of the statute creating it, unless the language of the statute fails to apprise the defendant of the real offense with which he is charged.

7. SAME—*when acts and conversations of any of the defendants are admissible against all.* In the prosecution of several persons

for arson, if the evidence on the part of the People shows a.con-spiracy among the defendants to burn the building and stock of goods, the acts or conversations of any of the defendants in carry-ing out the conspiracy are competent against them all.

8. SAME—*uncorroborated testimony of accomplice may sustain a conviction.* While the testimony of an accomplice is subject to suspicion and should be received with caution, yet it may be suffi-cient, uncorroborated, to sustain a conviction.

9. SAME—*party is not entitled to separate trial as a matter of right.* A party indicted with others is not entitled to a separate ·trial as a matter of right, but his application for separate trial is addressed to the sound discretion of the court, and unless the court abuses its discretion in refusing the application such refusal is not ground for reversal.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. RICHARD E. BURKE, Judge, presiding.

STEDMAN & SOELKE, (PETER E. GREENLIMB, of coun-sel,) for plaintiffs in error Paul Covitz and Edward Covitz.

CLARENCE S. DARROW, and PATRICK H. O'DONNELL, (THOMAS MARSHALL, of counsel,) for plaintiff in error Joseph Clarke.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and C. H. LINSCOTT, (FRANK JOHNSTON, JR., and EVERETT JENNINGS, of counsel,) for the People.

·Mr. JUSTICE FARMER delivered the opinion of the court:

This writ of error was sued out by Paul and Edward Covitz and Joseph Clarke to reverse a judgment of con-viction in the criminal court of Cook county for the crime of arson..

Paul and Edward Covitz were partners under the firm name and style of Covitz Bros., and were wholesale and retail woolen goods merchants, occupying the basement and first story of a building at No. 20 South Fifth avenue, in Chicago, belonging to Joseph Downey. At the time of the

fire they had a stock of goods variously estimated by the witnesses at a value of from $9000 to $45,000. It was insured against loss by fire for $34,500. A fire occurred in the building on the night of November 5, 1912, burning and damaging the entire stock. The fire was discovered shortly after midnight and an alarm turned in. Two companies of firemen arrived at the building within five minutes after the alarm was given. When they arrived the building was burning on the first floor, in both the front and the rear. There had been an explosion in the building before they arrived and glass was blown out of the front over the sidewalk and street. The explosion was of such force as to break glass in other buildings near the one where the fire occurred. The fire was soon subdued after the arrival of the firemen, and as soon as the heat would permit the firemen went into the building. They testified there was a strong odor of gasoline in the building, that bolts of woolen cloth were strewn about the building, and that they appeared to have been saturated with gasoline. Two empty gasoline barrels were found in the building in the rear portion. When an entrance was effected by the firemen into the basement they found gasoline had seeped through the floor, run over boxes stored in the basement and was burning with a blue flame. The Covitz brothers came to the scene of the fire and were asked a number of questions about the stock of goods and their ownership of it, how the store was closed and fastened, etc., the night before. They were arrested the morning after the fire and taken to a police station but were subsequently released on bail under a writ of *habeas corpus.* After the return of the indictment charging Paul Covitz, Edward Covitz, Joseph Clarke and John Danies with arson, Danies was arrested in the city of New York. He waived extradition and was brought to Chicago and placed in jail. He testified he remained in jail about two hours; that he was promised immunity by the State's attorney if he would tell the truth,

and upon his agreement to do so he was taken to the Bradley Hotel, where he had continued to live up to the time of the trial. He testified that he was there with officers and was receiving a couple of dollars a week from the State's attorney's office as spending money. There is no doubt, and it is conceded, that the fire was of incendiary origin, and it is not denied gasoline had been thrown, over the building and goods before the fire was started.

Plaintiffs in error Paul and Edward Covitz moved the court to quash the indictment. The motion was overruled. All three of plaintiffs in error moved in arrest of judgment. This motion also was overruled, and it is contended that these rulings were erroneous. The basis of this assignment of error is the claim of plaintiffs in error that the indictment did not charge the crime of arson.

The indictment was under section 13 of the Criminal Code, which reads as follows: "Every person who shall willfully and maliciously burn or cause to be burned any dwelling house, kitchen, office, shop, barn, stable, storehouse, warehouse, malt house, stilling house, factory, mill, pottery or other building, the property of any other person, or any church, meeting house, school house, State house, court house, work house, jail or other public building, or any boat or other water craft, or any bridge of the value of $50 erected across any of the waters of this State, such person so offending shall be deemed guilty of arson, and upon conviction thereof shall be punished by imprisonment in the penitentiary for a term not less than one year nor more than twenty years; and should the life of any person be lost in consequence of any such burning, such offender shall be deemed guilty of murder, and punished accordingly." The indictment consisted of three counts. The first count charged plaintiffs in error willfully and maliciously burned a certain building situated in the county of Cook, State of Illinois. The second count charged they caused to be burned a certain building, etc.; and the third count, that

they burned, and caused to be burned, a certain building. All the counts allege that the building was the property of Joseph Downey.

It is claimed our statute is an expansion of the common law to make certain acts not theretofore arson come within this definition of the crime, and the indictment should describe the property burned and then aver as in cases of larceny by embezzlement, and so the defendant committed the crime of arson; that the common law only protected houses used for the habitation of man, and it was neither averred nor proved that the building alleged to have been burned was so used, and the indictment is insufficient to charge the common law offense of arson. It is further insisted that "building," in the phrase "or other building," in section 13, is a generic term and embraces every structure like or of the class of those specifically enumerated, and the indictment should have described the building alleged to have been burned, so as to show that it was like or of the class of structures specifically enumerated; that it should have been designated by a specific name, if it had one, and if it had none, it should have been described so as to "individuate" it, by alleging it was a building used, etc., stating what it was used for. For these reasons it is asserted the structure alleged to have been burned was not a building within the meaning of the statute, and the accused were not informed by the indictment of the charge they were required to meet on the trial, and it is also claimed the offense was not sufficiently charged to enable the accused, after an acquittal or conviction, to protect themselves from a second prosecution for the same offense.

Arson, at common law, was the willful and malicious burning of the dwelling house, or out-house within the curtilage of a dwelling house, of another person. It was an offense against the habitation and regarded the possession rather than the property. The occupant was not guilty of arson if he burned the building he lived in. An indictment

was required to allege the property to be the property of the one in possession, as the burning of the dwelling house was not regarded as an offense against the property, and punishment for it was intended to protect the occupant and not the owner. Section 13 of our statute, after specifically enumerating several structures, in addition to the dwelling house and out-houses used in connection therewith, as the subject of arson, adds, "or other building, the property of any other person," and this is followed by the enumeration of public buildings, boat or water craft, or any bridge of the value of $50 erected across any of the waters of the State. These latter structures, as well as many of those before specifically enumerated, are not structures for habitation, but the willful and malicious burning of them is defined as arson. It seems clear to us this legislation was intended to protect property, and not merely the habitation, as was the case at common law. It incidentally afforded protection to the habitation but it was intended for the protection of property, and under the statute a tenant in possession who willfully and maliciously burns a building of his landlord is guilty of arson. Section 19 of the Criminal Code provides that an indictment for arson for setting fire to or burning any building which was occupied is sufficient if it alleges the building was the property of the owner, lessee or occupant, and if unoccupied, to so allege. This changes the common law rule of pleading, which required the indictment to allege the building was the property of the occupant, and further evidences that arson was defined and its punishment provided for, for the protection of the property enumerated. The statute enumerates a number of buildings or structures the burning of which would constitute arson, and among those enumerated are structures intended for habitation. It also enumerates structures not so intended and makes the burning of them arson. The object of the legislation being the protection of property, it was not intended that only burning the buildings specifically

mentioned should constitute the crime of arson. The difficulty of specifically naming every kind of building it was the purpose to protect is apparent, and so the act provides that not only burning the structures or buildings named, but also any "other building, the property of another," should be arson and punished accordingly. If the strictness of the common law rule is to be applied, then it would probably require holding the indictment did not sufficiently state the offense, but in our opinion the reason for the common law rule ceased with the enactment of section 13, and when the reason ceased the rule ceased. The situation does not appear to us different from what it would have been if the statute had named no buildings but simply provided that the burning of any building the property of another should constitute the crime of arson. The indictment charged the offense in the language of the statute creating the offense, and paragraph 408 of the Criminal Code makes such an indictment sufficient. This is subject to the exception that where the statute fails to describe the offense so that the use of the language of the statute in the indictment would not apprise the defendant of the real offense with which he is charged, then the facts constituting the crime shall be set forth. (*Cochran* v. *People,* 175 Ill. 28.) It is the right of a defendant to know the nature and cause of the accusation against him, and when the indictment is sufficient to apprise him of it, it is sufficient to meet the requirements of the constitution in that respect. Plaintiffs in error were charged with burning a building the property of Joseph Downey. Two of them occupied, as lessees of Joseph Downey, the basement and first story of a building belonging to him, which was burned November 5, 1912, the date alleged in the indictment. They were as well informed of the particular offense with which they were accused as if the indictment had particularly described the building. If the indictment should be held insufficient, it would not be because, as a matter of fact, plaintiffs in error were not

apprised of the particular offense with which they were charged, but it would have to be because the indictment did not describe the building with the "technical niceties" of the common law precedents. It would not be because plaintiffs in error were injured or suffered any prejudice because the building was not particularly described, but because the indictment did not meet the technical requirements of the common law rule, founded upon good reasons at the time of its adoption but which reasons do not now exist in this State. No possible injuries resulted to plaintiffs in error from requiring them to go to trial upon this indictment. If they were innocent they were in nowise prejudiced in making their defense on account of the indictment. If they were guilty they should not be relieved from the verdict and judgment because the building they burned was not described with greater particularity. The statute makes the burning of a building the property of another arson, and we think the indictment sufficiently charged the offense. In *Morton* v. *People,* 47 Ill. 468, the indictment charged the defendant with obtaining the money of another by means and by use of the confidence game but did not set out or specify the particular acts or means used. This court held the indictment sufficient, and that case has been cited with approval many times and down to as late as *People* v. *Clark,* 256 Ill. 14. The following cases, though some of them are not directly in point, all support, or tend to support, the sufficiency of this indictment as a charge of arson: *Lipschitz* v. *People,* 25 Col. 261; *Garrett* v. *State,* (Ind.) 10 N. E. Rep. 570; *Jordan* v. *State,* 41 id. 817; *McClaine* v. *Territory,* 1 Wash. 345; *Commonwealth* v. *Hayden,* (Mass.) 50 N. E. Rep. 51; *Commonwealth* v. *Smith,* 24 id. 677; *People* v. *Russel,* 81 Cal. 616. The views we have expressed are not in conflict with anything involved or decided in the case of *Mai* v. *People,* 224 Ill. 414.

Paul and Edward Covitz moved for a separate trial. They set up in an affidavit in support of their motion that

they were informed and believed Danies, one of the parties jointly indicted with them, had made a confession; that his name was indorsed on the indictment; that he was to be one of the chief witnesses for the prosecution; that affiants were informed he had an arrangement with the State's attorney by which he was to receive immunity in consideration of his testifying against affiants. The affidavit further stated that Joseph Clarke, one of their co-defendants, was charged with arson in twenty-nine other indictments returned against him; that John Danies is a co-defendant with Clarke, who is an insurance adjuster, and charged jointly with Danies in many cases for burning, and conspiracy to burn, property to defraud insurance companies. Affiants alleged they were informed the State's attorney would offer proof that Clarke, before any indictment was returned against affiants, offered to bribe an assistant State's attorney to use his influence in preventing an indictment being returned against affiants; that the State's attorney proposed to prove by Danies that he and Clarke had been guilty of a system of combination and conspiracy to defraud insurance companies by burning property; that affiants had no knowledge of and were not guilty of said conspiracy, if it ever existed; that they were not present when the alleged attempt to bribe the assistant State's attorney was made, did not authorize it and had no knowledge of it. For these and similar reasons they asked for a separate trial. The court denied the motion and this is one of the errors assigned.

Danies was called as a witness for the prosecution and testified that his residence for the last ten years had been in New York City; that he had previously lived in Chicago about ten years; that he met the plaintiff in error Joseph Clarke first about three years ago and was introduced to him by Harry Brown, an insurance solicitor; that he afterwards met Clarke in New York with a man named G Rosen, from Blue Island avenue, Chicago. He testified that

he received a letter in New York from Joseph Clarke and Harry Brown requesting him to come to Chicago. He destroyed the letter and shortly afterwards came to Chicago, arriving there about the last of October before the fire. After arriving in Chicago he attempted to get into communication with Harry Brown by telephone, but failing to reach him he went to the residence of Joseph Clarke, at No. 20 Prairie avenue, Chicago, arriving there in the evening about six o'clock, where he met Clarke. Danies testified he and Clarke shook hands and Clarke said he was glad to see him and inquired if he had received his letter. Danies told him he had, and Clarke told him he had a nice job for him where he could make a good piece of money but the place must be totally detroyed. He said the place referred to was the Covitz brothers' place. Clarke instructed Danies to go to the Covitz brothers' store, No. 20 South Fifth avenue, and represent himself as a fire insurance man for the underwriters, and see how much gasoline he could use in the place. The next day after this conversation Danies went to the Covitz brothers' store and represented himself as an insurance man. The Covitz brothers took him into a back room, told him they knew him, and that they wanted the place totally destroyed; that they wanted the roof, top floors and ceilings down, so that the goods from above their store would come down and everything be mixed up and burned so that nothing could be seen when the fire was over. Danies asked the Covitz brothers to give him cloth to make a suit of clothes, and they gave him three and one-half or three and one-fourth yards, which he had made into a suit, and which was the suit he had on at the time he testified. The Covitz brothers asked him to go down into the basement and look it over, which he did, and found there a lot of boxes and rubbish. When he returned from the basement to the Covitz brothers on the first floor, Edward Covitz told him he (Danies) had done a good job on Clark street on Nudelman's shoe store, and that

"he had a great opportunity for pleasure to see him do a good job for him." Danies then left the Covitz brothers' store and went to Clarke's residence, arriving there about six o'clock in the evening. He told Clarke one fifty-gallon barrel of gasoline would be sufficient, but Clarke said they would put two barrels in; that the total destruction of the place was desired, as the Covitz brothers' stock was not worth as much as it was insured for and they wanted the destruction to be so complete that nothing could be seen. Clarke agreed to give Danies $700 and if everything was destroyed an additional $50. Danies demanded payment before the fire, to which Clarke agreed, and they were to meet on November 5 at the corner of Washington and Kedzie avenues, where the money was to be paid. Clarke told Danies he got $2000 from the Covitz brothers, and he was to pay the man who would totally destroy the building and goods $1000; that he would have to give $300 to get a man to bring two barrels of gasoline, and if Danies would furnish the gasoline he could have the full $1000. Danies agreed to accept the $700, with the additional $50 if destruction was complete, and Clarke was to furnish the gasoline. Clarke said he had a man that furnished him gasoline. Danies went to the corner of Washington and Kedzie avenues about two o'clock on the day appointed, and Clarke came in a machine and handed him $700 and a key to the Covitz brothers' place of business. He told Danies to see that the place was entirely destroyed; that if he did the job right he (Clarke) had more jobs for him, but if he did not he could do no more work for him. He testified the gasoline was brought to the Covitz brothers' place of business between two and three o'clock in the afternoon of November 5, which was election day. Clarke instructed Danies to go to the Covitz brothers' place at six o'clock, which he did, but found the store closed. His understanding with Clarke was that the Covitz brothers would meet him in the store. Danies unlocked the store, went in and

saw the two barrels of gasoline in boxes. He then left the store and returned in about fifteen minutes, when he found both Covitz brothers there. He told them to stay in the store until he unpacked the two barrels of gasoline, as the way they were boxed it would take a lot of hammering to open them. The Covitz brothers stayed in the front part of the store, measuring cloth, while Danies took the barrels out of the boxes and opened them up. He said this required more than an hour. After he had finished he told the Covitz brothers they could go, and they left, wishing him good luck as they went out. When they were gone he took pails and started throwing or pouring the gasoline around in the building, and about the time he had emptied one barrel he was overcome with the fumes and became unconscious. He intended to fire the building about eight o'clock, but he did not regain consciousness until about twelve, when he emptied the other barrel by tipping it over on the floor. He was enabled to complete this work by getting to the back door, opening it and getting some fresh air. After he had finished distributing the gasoline he put his overcoat on and lighted a match to throw and start the fire, but when he lighted the match there was an explosion. He had arranged to make his exit through the back door, which he had partially opened, but when the explosion occurred its force closed the door, shutting off his escape. His clothing caught fire and he was pretty badly burned about the face and hands. He was unable to make his escape until a second explosion occurred, which blew out the front of the building. He then succeeded in opening the back door and went out in the alley and then back in the rear of the building, where he threw his overcoat off. It was raining hard, and he afterwards picked up his overcoat and went out through the alley to Fifth avenue. In going through the alley to Fifth avenue he saw and spoke with a man at the door of the building of the *Illinois Staats Zeitung,* which is just across the alley from the building

that was burned. From Fifth avenue he went to Lake
street, took a car and went to his room, which was at
Washington and Kedzie avenues. There he put some cloth-
ing in a grip and then went to Clarke's house. Mrs. Clarke
was there, let him in and took him to a sitting room down
in the basement. He took off his burnt clothing and put
on another suit, and Mrs. Clarke mixed up some eggs and
put them on his hands and face to cool the burns. About
that time Clarke returned home. The witness testified his
hands and face were "heavy burnt." It was about three
o'clock when Clarke came home. When he saw how the
witness was burned he said, "For God's sake! How did
you come out alive yet?" They put the witness' damaged
clothes in a boiler and burned them. He stayed at Clarke's
the rest of the night and until the next evening about half-
past eight. He didn't see Clarke during the day, but when
he came home in the evening witness told him he was get-
ting bad and couldn't stay there any longer; that he was
feverish. Clarke said he had no place to put him; that all
the doctors and hospitals had been notified a burning man
was seen going out of the building. The witness said he
couldn't stay there and die, and Clarke asked him if he had
any relations. Witness said he had, and Clarke took him
in his machine to the witness' room, where he packed his
things, put them in the machine, and Clarke took him to the
house of the sister-in-law of witness' wife, at 7915 Wood-
lawn avenue, where he stayed six or seven days, and from
there he went to the Calumet Hotel, at Grand Crossing.

The barrels, and the boxes from which they were taken,
were in the rear of the store and were not destroyed. They
were produced at the trial and identified by Danies as be-
ing the same he opened in the building and took the gaso-
line from, and they were also identified by firemen, one of
whom wrote his name on the barrels the night of the fire.
The boxes were braced in such manner as to hold the bar-
rels and prevent their slipping about in the box.

Patrick Egan, chief of the first battalion of the fire department, testified they got the alarm at ten minutes past twelve and were at the fire in three or four minutes. As soon as the heat would allow, after the fire was under control, he and other firemen went into the building and found bolts of woolen goods strewn all over the store and burning. There were evidences of oil on the goods and the smell of gasoline in the building. The witness picked up one bolt of goods to save for evidence and gave it to one of his men to carry out. In carrying it the man brought it near a broken pipe hanging from the ceiling, from which a flame was burning. The bolt caught fire and he had to throw it down and put water on it to put it out. The flame from the burning goods was like a blue gasoline flame. The firemen tried to get into the basement, but were unable to do so from inside the building and effected an entrance from the sidewalk in front. There were a lot of boxes in the basement and fire was burning on these boxes. Where they were open, oil had come through the floor and dropped into them and they were burning inside with a blue flame. Witness wrote his name on the gasoline barrels and took charge of them and the boxes they were taken from, and identified them at the trial as those taken out of the building. Before the witness left the building the Covitz brothers came, and Mike Sullivan, fire attorney, asked them what time they closed the store, and one of them said he locked the front door when he was leaving.

Michael Sullivan testified he was fire attorney for the city of Chicago on November 5, 1912, and went to the fire. He substantially described the conditions the same as Egan. He testified to finding a pail which was burned on the inside and putting it into one of the barrels for safe keeping. He had a conversation with both Paul and Edward Covitz that night at the building but does not state what it was. They were arrested that night and taken to the police station and were afterwards brought to the fire marshal's of-

fice in the city hall and questioned at some length. They said as it was election day they had let their employees go; that they had a girl and boy who were not voters, and they let their man go earlier than usual and the boy also. They said two packing cases arrived the afternoon before the fire and were hauled to the store by their regular drayman from the Nickel Plate or Lake Shore depot. When asked who the drayman was, they said they had three; that one was Dixon, another Stockton, and the other one they did not know. Paul Covitz said, when not in the presence of his brother, the goods arrived after the employees had left the store; that they opened them up, but found so many bolts in the boxes they concluded to not take them out or check them off until morning. The other Covitz said they had not opened the boxes; that the job was too strenuous for them and they put it off until next morning, to be done by their regular man. Both Covitz brothers were asked where the barrels came from, and said they never saw them.

James Ryan was at the time of the fire, and previously, employed by Downey, the owner of the building, as elevator man and fireman in the building. He operated the elevator to take goods up to the upper floors. He testified he helped tenants and teamsters take cases off wagons and get them in the building. Between two and three o'clock on the afternoon of November 5 two wooden cases, about three feet high and two feet wide, were brought to the building. The witness never saw the teamster before who brought them but he offered to help unload the boxes. They were unloaded by sliding them down a two-inch plank from the wagon. The Covitz brothers themselves were assisting and told the witness they could handle them. The teamster also told him they could handle the goods themselves. When they were unloaded the Covitz brothers see-sawed the cases in the building on the floor and did not turn them over in taking them from the wagon or getting them into the building. He testified the custom of the Covitz brothers was to

unpack or have unpacked the goods delivered at once upon
their arrival and then shove the cases down into the base-
ment.  He testified that the goods were usually delivered by
Dixon and Stockton to the Covitz brothers.  The man who
delivered these two cases was of dark complexion and about
twenty-one years of age.  The wagon was a mattress or
box-wagon and was pulled by one horse.  The witness tes-
tified the next morning after the fire the boxes were in the
hall by the elevator, in the same condition they were in
when produced at the trial.

A. A. Bach, deputy State fire marshal, testified he took
part in an examination of Edward Covitz at his (Bach's)
office about noon the day after the fire, and that 'F. L. Sal-
isbury, attorney for the fire department, several police offi-
cers and witness' stenographer were present.  He testified
Edward Covitz said the boxes came the day before, at about
four o'clock, and he and his brother unloaded them.  He
did not open them and did not know what they contained.
He had excused his man and boy about 1:30 o'clock so the
man could vote, and he had nothing for the boy to do.  The
witness was at the building in the morning when the Covitz
brothers were there, and testified Edward Covitz was asked
if he had ever seen the barrels, and he said he had not but
that he had received the boxes; that they came in the day
before about four o'clock.

Della Elmer, Bach's stenographer, testified she took
down in shorthand what occurred when Edward Covitz
was in Bach's office.  Her testimony corroborated Bach as
to what was said, but was fuller, as it was taken down at
the time.  She testified Edward Covitz said the value of
their stock was about $55,000; that he saw the two boxes
brought to the store about four o'clock the previous after-
noon but had never seen the driver before; that he sup-
posed the boxes contained woolens from New York; that
he helped take the boxes off the wagon; that their man
and boy were gone, and the boxes were placed inside, near

262   34

the back door, but were not opened; that the man who delivered them was of middle age; that the indebtedness of the firm at the time was approximately $12,000 or $13,000.

Police officer Burke testified he was present the morning of the fire when Edward Covitz was taken to where the barrels were and asked if he had ever seen them before, and that he said no. He was then asked if he had ever seen the boxes or used them in his place of business, and he said he had no barrels or boxes in his place of business. He said they received two boxes of woolen goods from New York, brought them in the store, started to open them, but did not finish because they did not have the tools to open them with. He was asked if he smelled gasoline, and replied he could not smell.

George W. C. Brandt, a police reporter for the *Chicago Record-Herald,* testified he was in the office of the fire marshal the day after the fire, when the Covitz brothers were there; that Edward Covitz was asked who brought the boxes, and said he could not remember. He said there had been no barrels brought into their place of business. Paul Covitz admitted the boxes were brought in and said the goods had been unpacked and put in stock by someone whom, as the witness remembered it, he called Mike. He denied knowing anything about the barrels.

There was other testimony corroborative of what we have set out, but we deem it unnecessary to further give its substance.

Edgar Selbman, city editor for the *Staats Zeitung,* testified that upon hearing the explosion in the Covitz brothers' building he went to the door and saw a man in the alley with a kind of torch in his hand; that he started toward him but lost sight of him, and as he went back toward the corner he saw a man with a gray sweater, and witness went back to his office. He said something was burning at the right hand of the man he first saw running up a north and south alley. He identified Danies as the man he saw.

George Tomassow, society editor of the *Staats-Zeitung*, was in the building of that paper when the explosion occurred, and he testified there were two explosions, three or four seconds apart; that he went to a door in the alley of the *Staats Zeitung* building, opposite the Covitz brothers' place, and saw the fire. In about one-half minute a man came up to where the witness was standing with the editor of the paper, and they talked to the man a little while about the fire, and he disappeared. He said the man stood near them probably one-half minute; that he wore a gray sweater, and the witness saw plainly his face and features, as it was very light where they were on account of the fire. He identified Danies as the man he saw in the gray sweater. He testified to Selbman chasing a man into a north and south alley, and the witness at the time thought the man was probably the janitor.

Henry Cohn testified he was a fire insurance adjuster for the assured and had been about twenty years. He lived in Chicago and had known Joseph Clarke about thirteen years. In March after the fire he saw an article in the paper about Danies, and in about a couple of days afterwards Clarke called witness up by telephone and asked him to come over and see him. He went to Clarke's house, on Prairie avenue, and Clarke said to him he supposed witness had seen in the newspaper that Danies had been arrested in New York and was going to be brought back. The witness replied he had read the article, and Clarke said he wished he would do him a favor and get some lawyer to take care of Danies when he was brought back, so he would not talk. Clarke said, "If he does talk it will be bad for us," and the witness said he had nothing to do with it and was never mixed up in that kind of an affair, and told Clarke he had lawyers and to look after it himself, but Clarke said he couldn't show his hand, and witness said he would have nothing to do with it.

Edwin J. Raber, an assistant State's attorney, testified he had known Clarke since the first of the year. His special duties were presenting cases to the grand jury and drawing indictments. He first met Clarke about the 9th of January, in his (Raber's) office. Clarke had called him up the night before. A few days previous a man named Nathan came to Raber's office and said Clarke had asked him (Nathan) if he knew anybody in the State's attorney's office, and Nathan told him he knew Raber. Nathan said Clarke wanted to see the witness but did not want to meet him in his office at the State's attorney's office. The witness told Nathan if anybody wanted to meet him about a State's attorney matter he would have to come to the State's attorney's office. Nathan asked if it would be all right for Clarke to come there to see him, and witness said it would. Nathan said Clarke was a good fellow and would be a good man for Raber to meet; that he was worth $75,000 or $80,000 and gave a lot of business to lawyers. Afterwards Nathan telephoned witness that Clarke would be over to see him. On the evening of January 8 Clarke telephoned witness he would be over and the next day he came. Witness did not know his voice over the telephone but said Clarke referred to having telephoned him. The man who called the witness over the telephone said his name was Joe Clarke and that he was the person Nathan had spoken to him about. He told witness over the telephone he would rather see him at the witness' house, but witness told him he would have to see him at the State's attorney's office. Before Clarke came into Raber's office Raber had a glass panel removed from the door between his room and another. On Raber's side of the door was a drop window shade, and after the glass was removed he pulled this shade down and placed his stenographer in the other room next to the door, with a note book. When Clarke came into Raber's office, after some general conversation, he inquired whether Raber presented cases to the

grand jury. Raber told him he did, and that Michael Sullivan did also; that his (Raber's) special work was drawing indictments and Sullivan's special work was presenting cases to the grand jury. Clarke wanted to know whether Raber could present a case to the grand jury, and he tôld him he could. Clarke said Raber was the person he wanted to talk to, and inquired if Raber was a member of Golden Harmony Lodge. Raber told him he was, and Clarke said he was also and that he would talk to him like a brother; that he had the Covitz case, and there was $35,000 the insurance companies would not settle for until the case was disposed of; that the case was weak and there was nothing in it. Raber asked him what the evidence was, and Clarke said there was not much evidence. Raber said he understood there was a lot of kerosene used, and Clarke said the police had testified there was. Raber said if there was kerosene used somebody set fire to the building, and Clarke replied yes, but it couldn't be proved they did it, and when Raber asked how about the two barrels of gasoline found, Clarke asked how it could be proven they had put it in the building. After some more discussion about the evidence Raber inquired about the amount of insurance, and Clarke said that the Covitz brothers had about $35,000 or $40,000 worth of stock and $35,000 insurance. Raber said he understood some competent people had examined the stock and said there was only $8000 or $9000 worth, but Clarke said that was two or three days after the fire, when it could not be told how much of it burned up; that the Covitz brothers' books would show they had $35,000 of goods in stock; that there was a witness who wrote insurance who had been around the Covitz brothers' place of business a couple of times and looked at the stock who would testify it was worth about $35,000. Clarke said, anyway he did not want any differences about the case but wanted it thrown out and asked the witness to talk business. He said it was worth money to him, Clarke. Raber asked how

much it was worth, and Clarke said the attorneys charged the Covitz brothers $700 for the preliminary hearing; that there was $35,000 insurance being held up and that it was not pleasant to have an indictment hanging over them, and he finally told Raber he would give him $1000 to throw the case out, and if that was not enough he would do what was right. Raber told him the grand jury had control of that matter, and Clarke said it would be easy to bring in certain witnesses, ask them certain questions, and tell the grand jury that there was no case and no use spending the people's money trying it. Clarke then proceeded to tell the witness the names of persons he could examine and how to examine them, and proposed to see one witness named and tell him what questions would be asked and how to answer them. The witness suggested someone might throw a monkey-wrench into the indictment, but Clarke said he did not want it done that way; that he wanted it thrown out, but if the worst came to the worst it could be done that way. Raber asked if he had better speak to Sullivan about it, and Clarke said no, he wanted the witness to make all the money. Raber said Sullivan was in the grand jury room and could ask questions that would bring out all the evidence. Clarke asked how it would do to have somebody see Sullivan, and said he knew the fellow to see him. The man, he said, was a political friend of Sullivan and had married a cousin of the Covitzes. After further talk Raber asked Clarke when he thought he ought to pay the money, and he said the next day after "not a true bill" was voted. Raber said he thought he ought to pay a part of the money in advance, and Clarke said he would pay one-half of it in advance and the rest the day after the grand jury voted "not a true bill." Clarke then inquired, what if they indicted him after he paid the $500? and Raber told him if he took the money to prevent an indictment he would give it back if an indictment was returned. Clarke then discussed with Raber what he should say his

business there. had been, if anyone saw him leaving. Raber expressed some suspicion about that one of the Covitz brothers who wore spectacles, but Clarke said that one did not have nerve enough to set a fire; that he would send somebody else. He also said Covitz had an *alibi* and could prove that he was eight miles away when the fire happened. Clarke then left and the Monday following called Raber up at his house and asked if he could see him there. Raber told him he could not, and Clarke said he would be over to the State's attorney's office the next day. Clarke came the next day, and before he came Raber stationed a stenographer and a police officer on the opposite side of the door from which the glass panel had been removed. Before he came Clarke telephoned to Raber and inquired if the coast was clear, and upon being informed it was, he said he would be over in about five minutes. When Clarke came in he said a mistake had been made which was not his fault but was Raber's; that the man he spoke about to see Sullivan had seen him and agreed to fix the matter up and to give $1000. He said Sullivan was going to throw the case out, and that "those fellows" were raising hell with him for paying out more money when Sullivan had fixed it up, and wanted to know whom he (Clarke) was doing business with, but he refused to tell; that they could tear his tongue out but could not make him talk. He said they were accusing him of grafting. He would give Raber $500 and had brought $250 with him. Raber asked if he didn't think that was cheap, and he said he did but that it had cost "them" $1500. Raber asked if $1500 was not cheap to get the case settled, and Clarke said it was, but "the damn fools" objected to paying more when they could get it done that way. He told Raber he wanted him to make the money, and when they got the insurance he would try to make them pay the other $500, and if they didn't do it maybe he would pay it himself. He said he had lots of cases and lots of business to give, "and we will make

lots of money." He then gave Raber $250. Raber counted $100 and laid it in a book. He counted the other $150, folded it up, put a rubber band around it and put it in his pocket, and just at that time the door opened and the officer stepped in and placed Clarke under arrest and took him out of Raber's office.

On behalf of the prosecution, witnesses acquainted with the value of goods of the character of the Covitz brothers' stock testified they inventoried the goods immediately after the fire and that the stock carried by the Covitz brothers was of the value of about $9000 or a little over.

John Neimark, a tailor, testified he made the suit for Danies that he wore at the trial; that Danies brought him the goods November 2, 1912. He came back to the shop on the twelfth, and at that time his right hand was bandaged. It was not bandaged on the second. The clerk at the Calumet Hotel testified a man came to the hotel in November, about the sixteenth, and remained five nights. He was registered in the name of Schmidt and had a bandaged hand. He identified Danies as the man.

Julia Costez testified that she began working in Clarke's family, at his residence, in September or October, 1912, and worked there about six months. She saw Danies at Clarke's house about six weeks before Christmas, about eight o'clock in the evening. He rang the door bell and she opened the door and let him in. Clarke was not there and Danies waited until he came. She saw the two talking together and one time saw Mrs. Clarke take a dinner down in the basement. The basement door was locked a day or more.

On behalf of the defense, Paul Covitz testified the reasonable market, insurable value of the stock at the time of the fire was $45,000; that during the year 1911 they carried stock to the value of from $30,000 to $32,000, which was increased in 1912; that they took additional insurance to what they already had, in October, 1912, and that

at the time of the fire they were carrying from $33,000 to $35,000 of insurance; that it was all given to one solicitor, and all, or nearly all, of it was placed with one insurance firm. Witness testified the original invoices of the goods bought during the year 1912 were destroyed during the fire, but he produced duplicates which he testified he had received through the mails after the fire from the persons and firms the goods were bought from. He identified a book containing an inventory of stock up to December 31, 1911, from which it appeared the stock then inventoried $38,000. He testified no boxes or packing cases were received at the store on the afternoon of November 5, and that he did not on that day, with his brother, assist in removing any boxes from wagons into the store; that they received no barrels, and the witness did not talk to Ryan on that day or remember seeing him; that on November 4 they received two boxes through the alley entrance to the store, similar in appearance to those produced at the trial; that he and his brother, Edward, assisted in taking them off the wagon, and that Berkowitz, an employee in the store, was busy in the store at the time. Witness testified that as he went into the alley to assist in getting the cases in on November 4 he saw Ryan standing by the elevator shaft. He could not remember the kind of wagon the boxes were on, and said he seldom assisted in unloading boxes. They found a board in the wagon, placed one end of it on the wagon and the other at the alley door and pushed the boxes down the board. The boxes would weigh about 500 pounds each. They were shoved into the store, and witness and his brother tried to open one. They took off one or two boards to see what was in them, and they contained woolens. Berkowitz left the store the afternoon of November 5 about 2:30 o'clock to vote and did not return. Witness' daughter, who was employed in the store, was there until about five o'clock. He and his brother left about six o'clock and went home, arriving there about seven o'clock.

He ate supper with his family, and shortly afterwards his brother, Edward, and wife, and some other parties, came to his house and remained until about midnight. He had just retired when his telephone rang. His wife answered the call and was told the store was on fire. He called his brother, or had him called, and they went down to the fire. He said a good many people were there when they arrived, and on his arrival he was asked some questions about who owned the store, the amount of insurance carried and whether they had any barrels of gasoline, and he answered they carried $35,000 insurance and never had any gasoline. He was arrested, taken to a police station and kept in custody until about five o'clock in the evening. After his release he went to the office of the attorneys who secured his release and there met Clarke. He had never seen or talked with him before that or had any relations with him. Witness' wife introduced him to Clarke and said he was an adjuster; that Clarke learned the witness and his brother were under arrest and called her up and told her to come down and bring Mrs. Edward Covitz with her. Clarke then told witness he was a fire adjuster and would do the right thing for him, and witness said they would try to give him the adjustment of the loss. Witness denied seeing Danies at his store at any time, and denied knowing him or that he ever saw him until during the trial. He denied he ever authorized or requested Clarke to see Raber, and testified he never gave Clarke any money whatever to give Raber nor any money to give Danies, and knew nothing about anything of the kind. A freight bill of the Baltimore and Ohio Railroad Company was exhibited to the witness, dated November 1, 1912. Stamped upon it was, "2 cases woolens, weighing 1000 lbs." It bears the name "Covitz Brothers" written in lead pencil, which the witness testified was in his handwriting. It was signed in lead pencil, "D. Daley, Freight Agent." Written on it in lead pencil are the letters "Deld," and below is the figure "4."

This was offered in evidence for the purpose of showing the delivery of two boxes of woolens on November 4. The witness said he and his brother employed Clarke to adjust their loss and agreed to pay him ten per cent for his services, which included his services in getting the Covitz brothers out on bail. He testified there were some barrels in the store; that in some of them they kept a sweeping compound and some others were used as supports for table tops. They had been in use a long time.

The testimony of Edward Covitz was, in substance, corroborative of that of Paul Covitz. He testified the purchases of stock from January 1, 1912, to the time of the fire were about $50,000 and the sales about $60,000, and that the goods were sold at an average profit of 33⅓ per cent. His testimony about two boxes being received on November 4 and none on November 5 was substantially the same as his brother's. He denied ever having seen Danies until the time of the trial and denied knowing Clarke until after he was arrested. He denied giving Danies the goods for a suit of clothes. He testified there were no boxes in the rear of the store on November 5, 1912; that he left the store that day about six o'clock and he and his brother went home together; that after supper he went to his brother's house and remained until after midnight; that his wife and two cousins were with him; that after he returned home his brother notified him, by telephone, of the fire. He went down to the fire and was asked there whether they had gasoline in the store, and told them they had not. He was arrested and taken to the police station. At the fire marshal's office he was interrogated in the presence of a stenographer, and he admitted being asked, and answering, the questions as testified to on behalf of the prosecution. He said at the time he made the answers he thought they were correct, but had since found the two boxes he said were delivered the afternoon of November 5 were delivered the day before. He denied having known

Clarke until the day he was discharged on bail, and denied any knowledge of or responsibility for the interview of Clarke with Raber. He denied knowing anything about how the fire occurred or being in any way responsible for it, directly or indirectly.

Nettie Covitz, a daughter of Paul Covitz, had worked in the store about two years and kept the books. She assisted in making the inventory of the stock in December, 1911, and told in detail how it was made. She testified to the amount of sales for each month in 1912. She was in the store November 5 from 8:30 in the morning until five o'clock and saw no boxes delivered that day. Two cases of woolens were delivered the afternoon of November 4 and opened by Berkowitz, who was employed in the store, and they were unpacked and put in the stock.

Sam Berkowitz was employed in the Covitz brothers' store at the time of and prior to the fire. He helped take the inventory in December, 1911, and testified that about three o'clock on November 4 a couple of boxes were delivered in the rear of the store. The witness was busy and the two Covitz brothers helped unload and bring them in, and the witness saw Ryan standing by the elevator while this was being done. The witness opened the boxes. He left the store about two o'clock on November 5 to vote and did not return. He did not see anything delivered at the store before he left it. He said there were some barrels in the store used to support table tops and some used to hold sweeping compound.

Six witnesses on behalf of the defense, who were acquainted with goods of the character the Covitz brothers handled, testified as to the value of the stock. None of them made any careful examination, but from visits made to the store just prior to the fire and observations had of the stock upon these visits they estimated the value variously at from $30,000 to $50,000. Norman Wechsler, who worked in the store for the Covitz brothers until January 1,

1912, testified the stock inventoried at that time $38,000. D. W. Marks, of the Marks Teaming Company, and George Jezek, one of his drivers, identified the freight bill of the Baltimore and Ohio Railroad Company referred to in Paul Covitz's testimony, and testified the boxes named thereon were delivered November 4.

For the purpose of contradicting Danies as to the time the Covitz brothers left their store on November 5 the defense introduced three witnesses,—a father and two sons,—who testified they saw Paul and Edward Covitz on their way home on an elevated train about ten or fifteen minutes after six o'clock and saw them leave the train at the place they were accustomed to getting off. Christiana Chenisek, a servant in Paul Covitz's family, testified she was working for the family on November 5, 1912; that Paul Covitz got home that night at seven o'clock, and after supper his brother, his wife and two cousins came to his house and stayed until late at night. For the purpose of contradicting Danies as to Clarke being at Washington and Kedzie avenues at the time Danies said Clarke paid him the money, two witnesses were introduced who testified to being in Clarke's office that afternoon about the time Danies says he met Clarke at Washington and Kedzie avenues, a distance of four miles from Clarke's office. A young woman stenographer employed in Clarke's office testified on the same subject. For the purpose of contradicting Danies as to the time Clarke came home the night of the sixth of November, Clarke's stenographer testified she and Clarke worked in the office until after ten o'clock, when he took the witness home in his automobile. The witness testified she was with Clarke all evening until he took her home. Her mother testified to seeing Clarke bring her daughter home, and that it was between ten and eleven o'clock. Another witness testified he was at Clarke's house that evening from about seven-thirty to about nine o'clock and that Clarke was not at home while he was there.

Joseph Clarke testified he became acquainted with Danies in 1909, when he adjusted a fire loss for him. 'Danies was then going by the name of Kubizek. He denied writing Danies in October, in conjunction with Harry Brown, to come to Chicago, and denied seeing him in the month of October or November. He remembered seeing in the papers that Danies was arrested in New York, and on the Sunday following he called up Henry Cohn and asked him to come to his house. Cohn came, and Clarke asked him if Danies was the man he was doing business with years ago. Cohn said he was not, and Clarke expressed some doubt that Cohn was telling the truth. He told Cohn that some of the losses that he (Clarke) was indicted for were cases that Cohn ought to be indicted for instead of him, Clarke. He denied saying anything about getting a lawyer for Danies, and testified he first met the Covitz brothers November 6, 1912; that he did not see Danies in October; that from 1:00 to 5:30 o'clock on November 5 he was in his office, and he named two men and his stenographer as being there that afternoon. He had dinner at the Kaiserhof with his wife and son and remained there until 10:30 o'clock. He first heard of the fire about 12:30 or 12:35 o'clock, when Meyerhoff, who was in his employment, telephoned him. Witness got out of bed, dressed and drove to the fire in his automobile, arriving there about 2:30 o'clock. He stayed there until about four o'clock, when he and Meyerhoff went to his office and remained until after six o'clock in the morning; that he had breakfast at the Kaiserhof with Meyerhoff and went back to the fire. During the day he called up the wife of Paul Covitz and asked her to come down and bring Edward Covitz's wife. They came between twelve and one o'clock, and he sent them to a lawyer's office. He saw the Covitz brothers and their wives when they came back to the lawyer's office after they had been admitted to bail and had never seen the Covitz brothers before, and was introduced to them by their wives.

On that evening he had supper at the Kaiserhof with his stenographer, and a little after ten o'clock took his stenographer home and then went to his home. He denied taking Danies away from his (Clarke's) home that evening. He started to work to adjust the loss on the 7th of November and filed proofs with about twenty-five companies. He testified he telephoned Raber at his office on January 9, and, referring to an appointment that had been made for him to see Raber, says he told Raber he could not keep the appointment at two o'clock but would see him the next day, if convenient for Raber. He said Raber had an office at 139 North Clark street, and he asked if it would be convenient to see him there. Raber said it would not; that someone might be watching Clarke, and he preferred to meet him at the Criminal Court building. Clarke then suggested meeting Raber at his (Raber's) house, but Raber said he preferred to meet him at the Criminal Court building. Clarke inquired what time Raber wanted to see him, and he replied the following morning about ten o'clock. Nathan's name was mentioned in the talk, and Clarke said he was sorry he could not keep the appointment Nathan had made between them. Clarke said that it was agreed he should see Raber on Friday morning, and about eleven o'clock that morning Raber called him up and asked him why he had not come. Clarke said he was too busy but would be down at two o'clock. At that time he went to Raber's office, introduced himself, and said he supposed Raber knew what he had come for. Raber said, "Yes, brother Nathan told me all about it; you have come to see me about the Covitz brothers' case." Clarke answered he had, and Raber inquired what he wanted to do with the case. Clarke said "these boys" had been held over to the grand jury and brother Nathan told him Raber had charge of the grand jury, and that if there was anything he could do to help the boys out he (Clarke) would appreciate it. Clarke then asked Raber about his belonging to the Golden

Army, and if he was a Mason, and to what lodge he belonged. Raber asked Clarke what there was in it, and Clarke addressed him as brother Raber and asked what he expected. Raber inquired about how much insurance the Covitz brothers had, what Clarke's contract with them was and how much the loss was. Clarke told him the insurance was $35,000, that there was a total loss, and that he had a contract to adjust it for ten per cent. Raber said if the Covitz brothers hired a lawyer they would have to spend $2500. Clarke said they could not afford that as they had paid $750 attorney's fees for their preliminary hearing, and Raber then asked if they would spend $1000. Clarke said they might; that he would see them if there was anything Raber could do for them. Raber wanted to know when they would pay it. Clarke asked Raber if he was practicing law, and he said he was; that he had an office at 139 North Clark street and could not afford to give up his practice; that he would take care of the case; that if there was no indictment, well and good, but if there was an indictment he would get some member of his firm to handle the case. Clarke told Raber that as he was a lodge brother of his he would as soon see him make money as somebody else. Raber said that he would want $500 when Clarke came back again and $500 when the case was over; that if the case didn't turn out well he would return the money. Clarke told him the names of witnesses he could call before the grand jury, and Raber wrote one name on a slip of paper. He then said he would see Clarke two or three days before the case went to the grand jury and get the rest of the names, and if there was an indictment returned he would put a monkey-wrench in it, so that when it came before the court it would be worthless. Clarke said that was not what he wanted, and Raber said to leave it to him. Clarke inquired when the case would come before the grand jury, and he replied probably the latter part of the month. Raber asked Clarke if the loss was crooked

and if he did not think the Covitz brothers had made the fire. Clarke said he knew nothing about that but thought the loss was straight. Raber inquired who was back of the case. Clarke referred to chief Egan's testimony in Judge Wells' court, and said he might have his reasons for knocking the case; that the rest of the firemen were working under him and might follow him, but said he thought there was nothing to the case. Raber then asked Clarke how he stood with Mike Sullivan, and Clarke said they were bitter enemies. He asked Clarke if he couldn't arrange to have Mike Sullivan as a friend in the case, and Clarke said he did not see how he could, but suggested the name of a man who was a friend of Sullivan and also of the Covitz brothers, and said the man referred to had told him (Clarke) Sullivan had promised to do all he could for the boys. Clarke testified that he had not talked to the Covitz brothers at all about the case and never received a cent from them at any time and they knew nothing about his seeing Raber. After making an appointment with Raber to meet him again on the following Monday at ten o'clock at the Criminal Court building Clarke left Raber's office. About eleven o'clock Monday morning Raber called Clarke up by telephone and inquired why he didn't come over, and said this was the second time he had disappointed him. Clarke said he would be over in the afternoon. He did not go until the next morning, and before going he called Raber up from a drug store near by and said he would be over in a few minutes. Raber said all right. When he went to Raber's office he asked Raber if he had the "papers in that case." Raber said he had. Clarke inquired what he had found out, and Raber said it was as Clarke had stated; that he could take care of it all right for him and would take it up before the grand jury. Clarke then told "Brother Raber" he was sorry to disappoint him but could not fulfill his promise to make him a $500 payment; that he had to speak to the Covitz brothers, and they said they did not

262 — 35

want an attorney until they found out what the grand jury would do; that they could not afford it. Clarke said whatever he paid Raber would come out of his own pocket, and he did not know whether he could collect it from the Covitz brothers. Raber said he did not want Clarke to pay it out of his own pocket, and Clarke said he had taken up Raber's time; that Raber said he was still practicing law, and if there was anything he (Clarke) could do to help him in good faith he was willing to do it, whether the money came out of his own pocket or not. Clarke told Raber he would give him $250 then and $250 when the case was disposed of. Raber wanted him to make it $750 when the case was disposed of, but Clarke refused to agree to that. Raber then said he would take the $250 then, and after the case was over, if Clarke could see his way clear, to pay $750. Clarke said: "I will do all I can, brother Raber; as long as you are practicing law and you want to take care of such cases, any time that I run across a case, or any of my friends, I will throw all the business I can in your way." Raber said he was practicing law and had an office at 139 North Clark street and told Clarke to look him up. Clarke then counted out and handed him $250.

Charles Meyerhoff testified he telephoned Clarke as soon as the fire was discovered, and that after Clarke came down to the fire about 2:30 o'clock he did not return home again that night. He and Clarke went from the fire to Clarke's office, remained there until six o'clock and then went and had breakfast together.

It is claimed by plaintiffs in error Paul and Edward Covitz that the jury were misled and prejudiced against them by the admission of evidence not connecting them with the crime charged except through the accomplice, and which evidence, it is contended, did not corroborate the testimony of the accomplice, Danies. It is also contended by all three plaintiffs in error that they were prejudiced by references made during the examination of witnesses by

the prosecution to other fires and by certain evidence admitted relating thereto, and that the conduct of counsel for the prosecution in the cross-examination of the plaintiffs in error and certain of their witnesses was unfair and prejudicial. It appears that previous to the fire under investigation there had been other fires in the city of Chicago, and that twenty-nine indictments had been returned against Clarke and fourteen against Danies on account of the fires. There was testimony tending to show the Covitz brothers had knowledge of one, at least, of these fires which Danies was responsible for, and that Clarke had some connection with adjusting the loss. · There was also testimony tending to show that Clarke was connected with the adjustment of a loss from another fire. It does not appear from the abstract filed by plaintiffs in error that there was any such error in this respect as to justify a disturbance of the judgment. In the brief filed on behalf of the plaintiff in error Clarke several pages of his cross-examination purport to be quoted from the stenographer's notes taken at the trial, but in many important respects what is complained of in the brief is not shown by the abstract. Certain testimony offered as against Clarke was not admissible as against the Covitz brothers, and in most all important instances the court sustained objections of the Covitz brothers as to the admissibility of the evidence as against them, but the proof on the part of the prosecution tended to show a conspiracy between Clarke and the Covitz brothers to burn the building and stock of goods, and evidence of the acts or conversations of either of them in carrying out the conspiracy was competent testimony as against all of them. (*Lasher v. Littell,* 202 Ill. 551; *Chicago, Wilmington and Vermilion Coal Co.* v. *People,* 214 id. 421; *Spies* v. *People,* 122 id. 1.) Under these authorities the testimony of Raber was competent as to all defendants.

Within reasonable limits, in the cross-examination of a witness, whether of the defendant who has testified in his

own behalf or of any other witness, considerable latitude is allowed. Some questions undoubtedly were asked and permitted to be answered on cross-examination to which the court might well have sustained objections, and a few questions were asked by counsel for the prosecution to which objections were sustained that counsel must have known should not have been asked, but from a consideration of all the testimony we do not think it can reasonably be said that any such latitude in cross-examination was permitted as to prejudice plaintiffs in error and deprive them of a fair trial.

No other reasonable conclusion can be drawn from the evidence than that the fire was an incendiary one, that Danies started it, and that he used gasoline to facilitate the fire before starting it. Plaintiffs in error do not deny these propositions, but claim that Danies' testimony, alone, is unworthy of belief, and that there was no corroboration of his testimony which tended to connect plaintiffs in error with the crime. They especially insist that the testimony of the two newspaper men who saw Danies coming out of the alley at the rear of the building immediately after the fire started, and who appeared, when one of them first saw him, to have a torch in one hand, also the testimony of the hotel clerk and the tailor that a few days after the fire Danies' hand was bandaged, and the testimony of the tailor that he made the suit of clothes Danies had on out of a piece of cloth brought to him by Danies on November 2, was incompetent and should not have been admitted. It may be conceded that Danies' testimony showed him to be a bad criminal, but even such a man may tell the truth, and it was for the jury to determine what weight and credit ought, under all the circumstances, to be given his testimony. This court has repeatedly held that while the testimony of an accomplice is subject to grave suspicion and should be acted upon with caution, it may be sufficient, uncorroborated, to sustain a conviction. (*People* v. *Feinberg,*

237 Ill. 348; *People* v. *Frankenberg,* 236 id. 408; *Juretich* v. *People,* 223 id. 484.)   It cannot be questioned that the contradictory statements made by the Covitzes before and at the trial as to the absence of barrels and gasoline in their place of business and the delivery of two boxes at the store the afternoon of November 5 tended to discredit them and corroborate and strengthen the testimony of Danies.   The fact, itself, that gasoline was at some time and in some way brought into the store before the fire tends to discredit the testimony of the Covitz brothers that they did not have any knowledge of it.   No reason other than that testified to by him appears why Danies should want to burn the stock of goods and building and bring two barrels of gasoline into the store for that purpose.   According to the weight of the testimony of plaintiffs in error's witnesses the stock was insured for substantially its full value.   According to the testimony upon this subject for the prosecution it was insured for about four times its value.   Plaintiffs in error insist the testimony for the prosecution as to the value of the stock is not reliable because it was based upon an examination made after the fire.   Most of plaintiffs in error's witnesses who testified upon this question based their testimony upon casual observance of the goods when visiting the store.   The value of the stock would depend largely upon the quality of the goods, and the proof showed the quality ranged from goods worth thirty-five or forty cents per yard to goods worth $4.50 per yard, and there was a considerable amount of the cheaper class of goods. Whatever the value of the stock may have been, there is no proof tending to show that anyone would be benefited by its destruction except plaintiffs in error.

Without further extending this discussion, we do not think a reviewing court would be justified in reversing the judgment if the other testimony complained of and to which we have referred had not been admitted, but we think there was no error in admitting it.   What Raber testified to, if

true, warranted the conclusion that Clarke was in the conspiracy with the Covitz brothers and equally guilty with them in causing the fire. Clarke gave a different version of his interviews with Raber from that testified to by Raber, but it was a question for the jury to determine which of the two was to be believed. Clarke appears to have been very active on behalf of the Covitz brothers immediately after the fire. He called up their wives, had them come down town, and sent them to his attorneys to secure the release of the Covitz brothers from imprisonment, which was accomplished by a writ of *habeas corpus.* At that time he claims he had never met and did not know them. This is not in any manner conclusive against Clarke and under different circumstances might be entitled to little weight, but it was a circumstance entitled to be considered with all the facts proven. Whether Cohn told the truth about Clarke wanting him to get a lawyer for Danies and keep him from talking when he was brought to Chicago from New York was a question for the jury to consider in connection with Clarke's version of his talk with Cohn. Nor can it be said that the proof introduced by plaintiffs in error for the purpose of showing that Clarke was not at the corner of Washington and Kedzie avenues at the time Danies testified he gave him the money, and that he was not at his house at the time Danies said he was there, also the proof to show what time the Covitz brothers went home on the evening of the fire, was so conclusive that the jury could not have reasonably done otherwise than believe it.

We have set out the substance of the greater portion of the most material testimony on both sides so that its discussion in detail is unnecessary. It is, of course, highly conflicting, but we cannot say the guilt of plaintiffs in error was not proven beyond a reasonable doubt.

A person indicted with others cannot claim a separate trial as a matter of right. An application for a separate trial is addressed to the sound discretion of the court; and

its refusal will not afford ground for reversal unless it appears there was an abuse of discretion. The general rule is that parties indicted jointly are to be tried together. (*Gillespie* v. *People*, 176 Ill. 238; *Doyle* v. *People*, 147 id. 394; *Spies* v. *People*, *supra.*) There was no abuse of discretion in denying the motion for a separate trial.

It is contended the court erred in permitting the People to prove what Edward Covitz said when examined in the fire marshal's office. The basis of this contention is, that it was, in effect, compelling him to give evidence against himself, in violation of his rights under the constitutions of the United States and of the State of Illinois. That question was not raised on the trial by any objection by or on behalf of Edward Covitz, was not ruled upon by the court and is not preserved for our review.

We find no error in the record that would justify a reversal of the judgment.        *Judgment affirmed.*