THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* NATHAN SPIRA, Plaintiff in Error.

*Opinion filed June 16, 1914—Rehearing denied October 7, 1914.*

1. CRIMINAL LAW—*uncorroborated testimony of an accomplice may warrant a conviction.* While the testimony of an accomplice is always acted upon with the greatest caution, yet a conviction may be had upon the uncorroborated testimony of an accomplice if it is of a character to satisfy the jury, beyond a reasonable doubt, of the guilt of the accused.

2. SAME—*what reference to the right of an accused to testify is not ground for reversal.* Where there are two defendants, one of whom testifies but the other does not, an instruction prefaced with the statement that "one accused and on trial charged with the commission of a crime may testify in his own behalf or not, as he pleases," and which then proceeds to state that if he does testify the same rules apply to him as to other witnesses, is not ground for reversal, although the prefatory statement is unnecessary. (*Baker v. People,* 105 Ill. 452, distinguished.)

3. SAME—*the State's attorney has a right to refer to evidence as uncontradicted.* The fact that the accused introduces no evi-

dence does not preclude the State's attorney from presenting the State's evidence to the jury as wholly uncontradicted, where such is the fact and no reference is made to the failure of the accused to testify in his own behalf.

4. SAME—*what sufficient averment of ownership of building in indictment for arson.* In an indictment for arson, if the building was occupied, it is sufficient to allege that it is the property of the owner, lessee or the occupant.

5. SAME—*when conviction will be sustained though chief witness is an accomplice.* A conviction will be sustained even though the chief witness is an accomplice whose conduct and character are such as to discredit him, where his testimony is sufficiently corroborated to warrant the jury in believing him.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.

ARTHUR C. BACHRACH, and FRANCIS J. SULLIVAN, (OSCAR BLUMENTHAL, of counsel,) for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and C. H. LINSCOTT, (FRANK JOHNSTON, JR., and EVERETT JENNINGS, of counsel,) for the People.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

The plaintiff in error, Nathan Spira, his brother, Benzoin Spira, David Rice and Max Feilschmidt were indicted in the criminal court of Cook county for arson, in burning, or causing to be burned, on May 7, 1911, a building used and occupied by divers persons for store and factory purposes in the county of Cook, the property of Albert Dickinson. The defendant David Rice could not be found. Max Feilschmidt was not put upon trial and was a witness for the People. The jury found Nathan Spira guilty, and he was sentenced to confinement in the penitentiary for an indeterminate period. Benzoin Spira was acquitted.

Sunday morning, May 7, 1911, at about 1:30 o'clock, the fourth floor of a four-story building owned by Albert

Dickinson, at Nos. 16-22 South Peoria street, was burned, together with a stock of hats, caps and children's dresses, the property of Benzoin Spira, doing business under the name of B. Spira & Co. The stock of merchandise was insured for about $17,000 and about $15,000 was collected. Nathan Spira was not one of the owners of the property nor interested in the business but was an insurance adjuster, and the whole matter of the insurance was turned over to him after the fire. The fire was of incendiary origin, and was started on the third and fourth floors of the building by the use of gasoline, with which the goods on the counters and tables were saturated and which ran off on the floor along the aisles, and burned the floor in streaks at the sides of the tables.

It was satisfactorily proved that the fire was set by Ben Fink, a witness in the case, who was shown by the defendants, in his cross-examination, to have been engaged in the business of setting fires for other persons for as much as three and a half years and had been indicted in a great many cases for setting such fires. He gave a full account of the means by which and the manner in which he set the fire, and the only evidence directly contradicting him was the testimony of three witnesses from Indiana, who said that on the night of May 6, 1911, they played poker for money with him in Brazil, Indiana, from between eight and nine o'clock in the evening until between two and three o'clock in the morning. The jury gave no credit to their statements, and after reading their examination and cross-examination we think the conclusion of the jury was right. Fink had no interest in the business or the property burned and sustained no relation to the owner that would cause him to burn it, and it cannot be doubted that in following the business in which he was engaged he set the fire at the instance of some other person and for some compensation. The question before the jury was whether Nathan Spira and Benzoin Spira were his employ-

ers, and the jury found that Nathan Spira was, but that Benzoin Spira, who was at the time in his summer residence at Paw Paw Lake, Michigan, was not.

The facts, according to Fink's testimony, were as follows: He met Nathan Spira in the office of Max Feilschmidt, a fire insurance adjuster, in the Roanoke building, in Chicago, and met him frequently for a number of weeks, until in February, 1911, Nathan Spira asked him to do a job of burning for him, saying that he did not want the fire to originate in his brother's place but on the floor below, to avoid suspicion. Fink agreed to do the job for $400, and Spira said that they would go and look over the premises when the hands were all away, and they went one evening at about 6:30 o'clock and met Benzoin Spira on the fourth floor. It had been agreed that Fink should say he wanted to get children's dresses, and was to look around and see how much gasoline would be needed. He followed the directions and looked around the place and told Nathan Spira that he would need fifty gallons. Nathan Spira told him that his brother was in very bad circumstances and would like to get a fire and pay up his creditors; that he had not got enough insurance and to wait until he had got more insurance, and Fink was to wait for an answer from the insurance company. A week before the fire Nathan Spira told Fink he had got the necessary amount from the insurance company and was ready, and Fink said he had got the gasoline over in his shed and would haul it over three or four days before the fire. Nathan Spira told him he would get a key to the third floor, and the fire should be started on that floor a few minutes ahead of time. On Friday night Fink engaged an expressman named Schneider to haul the gasoline to the premises, and Fink and the defendant David Rice took four ten-gallon cans of gasoline out of Fink's coal shed and the three rode on the wagon to the premises, where they unloaded the gasoline. Nathan Spira was there, and they carried the gaso-

line up-stairs to the fourth floor and put it in a big sample
trunk about four or five feet wide and seven feet long, and
Fink put rags over the cans, and moth balls to cover up
the smell of the gasoline.   On Saturday afternoon, which
was a half-holiday, Fink and Rice went up on the fourth
floor.   Nathan Spira was present, Benzoin having gone to
Paw Paw Lake.   Fink and Rice laid out the goods, and
put papers, ravelings, linings and other articles along the
aisles to keep the gasoline from dripping upon the floor.
There was a paper-box factory on the third floor, and Fink
scattered clippings from the paper boxes around the ele-
vator on that floor.   Fink and Rice remained and played
cards until about midnight and then got ready for the fire
by pouring gasoline over the goods and on the litter on
the third floor.   Fink used three fuses,—one on the third
floor and two on the fourth,—setting them so that those
on the fourth floor would start the fire on that floor about
two minutes after it started on the third floor.   The fuses
were set on fire and then Fink and Rice went out of the
window, down the fire-escape and out the rear.   After the
fire Nathan Spira gave Fink $200, and paid him the bal-
ance of $200 about six weeks later, in the office in the
Roanoke building.

Max Feilschmidt, whose office was in the Roanoke build-
ing, testified that he had been an insurance adjuster for
fourteen or fifteen years;  that he had known Nathan Spira
about twenty years;  that Nathan Spira asked him to assist
him in getting insurance on his brother's place, because the
insurance companies were canceling insurance;  that he in-
troduced Nathan Spira to a friend, through whom insur-
ance amounting in the aggregate to about $5000 was ob-
tained;  that he had a talk with Nathan Spira in his office
about a previous conversation with Fink, in which he up-
braided Nathan Spira for not telling him what he intended
to do, and told him that Fink had been there and said he
was going to have a job in the brother's place;  that Nathan

Spira was indignant and called Fink a vile name but asked Feilschmidt to be quiet and be a good fellow, and said that he did not intend to tell Feilschmidt, but if Fink had told him he would not deny it; that Nathan Spira and Fink came up to the office three or four days before the fire and asked him whether he had a friend in the express business; that Fink said he wanted to haul some goods from his office to his new residence; that the witness called up a friend in a neighborhood where there were a lot of expressmen, and Fink afterward said that he got an expressman; that after the fire the expressman was arrested, and Feilschmidt told Nathan Spira of the fact and asked him to pay for his lawyer because he hauled the goods over to the fire, and Nathan Spira said the man got paid for the job and let Fink settle it up; that a couple of months after the fire Nathan Spira brought him $75 for helping him get the insurance, and they had an unfriendly talk, but the witness took the money, as it was all he could get.

Ben Fink, who set the fire, was an accomplice of some other person. He could not gain anything from the commission of the crime unless the benefit came from someone interested in some way in having it committed. The testimony of an accomplice is always acted upon with the greatest caution and is frequently given under the strongest motives to escape punishment and fix the crime upon another. (*Hoyt* v. *People,* 140 Ill. 588; *Campbell* v. *People,* 159 id. 9; *Conley* v. *People,* 170 id. 587; *Cochran* v. *People,* 175 id. 28.) A conviction may be had, however, on the uncorroborated testimony of an accomplice if it is of a character to satisfy the jury, beyond a reasonable doubt, of the guilt of the accused. (*Honselman* v. *People,* 168 Ill. 172; *Kelly* v. *People,* 192 id. 119; *People* v. *Feinberg,* 237 id. 348.) The credibility of Fink was affected by the fact that he was a degraded criminal, and also to some extent by a transaction which occurred in the early spring of 1913, while he was in jail in South Bend, Indiana, charged with

arson in connection with what was called the Kahn fire. There had been many fires in Chicago believed to be incendiary, and an effort was made to get information concerning them from Fink. He claimed that his family was destitute, his wife sick, his doctor's bills unpaid, and that the arson ring had threatened to cut him off, and he had been in jail thirteen weeks and wanted $2000. On a promise of the money he made a statement of alleged incendiary fires in Chicago, and an attorney representing various insurance companies, by the advice of the State's attorney, went to South Bend and after the statement was made paid Fink $2000. Fink was released from the South Bend jail and brought to Chicago in the custody of an officer, and from April 7, 1913, he was kept in the custody of an officer at a hotel or hotels in Chicago at the expense of the county of Cook, amounting at the time of the trial in December, 1913, to $2038.25. The statement made at South Bend, however, did not implicate Nathan Spira in any way or relate to this fire, and no such statement was made until Fink went before the grand jury, and the indictment in this case was returned on October 23, 1913. After being brought to Chicago he was kept in the custody of the officer for the purpose of securing his attendance and making use of him as a witness, and he was promised immunity from any crimes concerning which he might testify. Max Feilschmidt, who had been an insurance adjuster, had been employed by the board of underwriters of the insurance companies as an investigator of fires and had received $125 a month for several months, and he had been kept for a short time before the trial at a hotel in the custody of an officer, at the expense of Cook county. In view of the character of Fink, his acknowledged complicity in the alleged crime and the facts shown on the trial tending to discredit him, we would be unwilling to affirm the judgment, if it rested on his testimony, without such corroboration

as would justify the jury in the belief that his testimony was true.

There was evidence corroborating Fink, both as to the fire and the connection of Nathan Spira with it. ·The evidence of a large number of firemen tallied exactly with his account of the manner in which the gasoline was applied and the places where it was used. William Schneider, the expressman, stated the facts concerning the hauling of the gasoline on a dark and rainy night, on a Friday. He thought it was a week before the fire, and he did not mention Rice as being with Fink and did not see Nathan Spira, who was said to be at the building. He had no particular occasion to remember the time of the fire more than a year and a half afterward, and there is no reason to question the fact that he hauled the gasoline. After the fire he went to the office of A. A. Arnold, who had the paper-box factory and was lessee of the entire building and under whom Benzoin Spira was a sub-lessee, and asked Arnold for his pay for the job, which was $1.50. He told Arnold that Fink hired him and said the boss would pay him. Complaint is made that this testimony was incompetent. Schneider testified to his conversation with Arnold, and Arnold afterward testified to the same conversation. No objection was made to the testimony of either on that subject and there was no ruling by the court. Arnold thought, from Schneider's manner, that he was connected with the fire, and when the State's attorney began to inquire of Arnold about steps taken to have the fire attorney meet Schneider to entrap him, objection was made and the court sustained it. Schneider was arrested and Feilschmidt urged Nathan Spira to help him, as before stated, and Spira gave Schneider $25 to pay for a lawyer, saying that he did not hire him but would take care of him if he would be a good fellow. Bertha Fink, wife of Ben Fink, testified that she had a conversation with Nathan Spira when her husband was in jail in Indiana, and said she needed money, and he said he

would give her money that was coming to her, and gave her $25 a week, paid her rent, which was $35 a month, and gave her in all $225, and told her if anyone came down from the State's attorney, to say she was sick, and if any nurse came around or they sent a doctor or nurse to take care of her, she should say she had her own doctor, and to say nothing. Nathan Spira went to South Bend when Fink was in jail and gave Fink about $15 to buy cigarettes or for expenses in jail, and told him his family had plenty of money and that his wife was getting plenty of money. Mollie Zar, a witness for the defendant, testified that Mrs. Fink applied to her for help, and Nathan Spira said he would help her and gave her $10 in the presence of the witness, but she said that the money given Mrs. Fink was collected from a person named Rosenberg, who paid about $200, and said that was all he owed Fink. Mollie Zar's husband had confessed to crimes of arson, and she was kept with him for a time at a hotel, and also testified that Fink told her at the hotel that unless Nathan Spira got in line and helped him he would put him in bad. This was denied by Fink, but seems probable in view of the fact that Fink made no disclosure about this fire as long as Nathan Spira was helping him.

Three employees of Benzoin Spira gave evidence tending to discredit Fink's testimony that the gasoline cans were in the trunk. They testified that the trunk contained furs used in trimming hats; that it was looked into from time to time and they did not discover any odor of gasoline or see any cans. If Fink's testimony is true, the cans were only in the trunk Saturday forenoon while the employees were there, and there was no evidence that the trunk was opened or looked into every day. There was an inventory after the fire, showing a total of $12,470.92 merchandise and $8280 fixtures, machinery, etc. Hyman Golbstreich assisted in making the inventory and was one of the witnesses who saw no cans in the trunk. There was evidence

of two witnesses that he had admitted that the schedule was a false one and the items over-valued and items in it which were not there at all, and that the defendants had given another witness connected with making the schedule which the other witness had said was a crooked one, $25 to get out of town.

So far as there was any evidence fairly tending to contradict that which was given on the part of the People it has been related. It will be seen that most of the material evidence was not contradicted, and we regard it as sufficient to sustain the verdict.

There are a number of complaints of rulings by the court. One is, that the court erred in permitting questions to be asked of the witness Mollie Zar. Her husband had been a member of the firm of Spira, Zar & Brown, of which Nathan Spira was a member, and her husband had made a confession, as above stated. The witness had come from Memphis, Tennessee, to testify and had been on terms of much intimacy with Nathan Spira, and had written to him from Memphis, saying that she wished he was there and that she missed him dreadfully. Questions were asked designed to ascertain whether there were immoral relations between them, and when asked, the attorney for defendants first objected and then said, "Go ahead," and if the State's attorney did not show it he wanted him punished for contempt. The attorney was objecting, consenting and protesting, and complaining that the State's attorney was insulting to the witness. She denied there were any immoral relations, and in view of what she had already stated the questions were not improper. The State's attorney also inquired of Mollie Zar about the connection of Nathan Spira with other fires and if he was not implicated with the other fires confessed by her husband, and whether it was not a fact that Rosenberg, who she said furnished the money paid by Fink, also had a fire loss. The questions were improper but objections were sustained to each, and we cannot say that the State's

attorney was not acting in good faith under the belief that he had a right to make the proof. There were frequent bickerings between the attorneys at the trial, all of whom were combative, and there were retorts and insinuations which were improper, but the rulings of the court were correct. It is true that the court confined participation in the trial to merely sustaining or overruling objections and did not exercise proper authority, which is to be regretted, but we find no sufficient reason in the conduct of counsel for reversing the judgment.

Benzoin Spira testified and Nathan Spira did not, and it is contended that the court erred in giving instruction 21, which is as follows:

"The court instructs the jury, as a matter of law, that in this State one accused and on trial charged with the commission of a crime may testify in his own behalf or not, as he pleases. You are instructed that when a defendant thus testifies in his own behalf you have no right to disregard his testimony merely because he is accused of crime; that when he does so testify he at once becomes the same as any other witness and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness; and in determining the degree of credibility that should be accorded to his testimony the jury have a right to take into consideration the fact that he is interested in the result of the prosecution as well as his demeanor and conduct while on the witness stand; and the jury may also take into consideration the fact, if such is the fact, that he has been corroborated or contradicted by credible evidence or by facts and circumstances in evidence."

A somewhat similar statement prefaced an instruction in *Baker* v. *People,* 105 Ill. 452, where a man and woman were indicted together and the statement used the pronoun "he," which was emphasized by this court and regarded as a device to call attention to the fact that the man did not testify. As Benzoin Spira had testified the jury necessarily

knew Nathan Spira could have testified if he had wanted to, and it is inconceivable that the instruction added anything to the knowledge which the jury already had. The statute provides that the neglect of a defendant to testify shall not create any presumption against him and it forbids reference to or comment upon such neglect. While the legislative declaration that no presumption shall arise from the fact that a person accused chooses not to contradict testimony concerning matters within his own knowledge cannot control or give direction to the natural operations of the mind as to guilt or innocence, the courts are bound to see that the command that no reference to or comment upon the fact shall be made is obeyed. The instruction in this case is different from the one in the case cited, which was equivalent to telling the jury that the man could have testified, and the purpose of this instruction was merely to state the rules applying to the testimony of Benzoin Spira, by saying that he could testify or not, as he pleased, but if he chose to do so, the same rules were to be applied to him as to other witnesses.

It is also claimed that the argument by the State's attorney to the jury was improper, particularly because he said that certain evidence was not contradicted which Nathan Spira alone could have contradicted. The State's attorney said to the jury, "Now, gentlemen, who denied that he went to the wife out here and gave her money? Nobody. Who denied that he went to South Bend and gave Fink money? Nobody." No objection was made and there was no ruling by the court, so that there is no action of the court to be reviewed. We could not, in justice to the People, establish a rule that because a defendant introduces no evidence, whether it be the testimony of some other person or of himself, the State's attorney is precluded from presenting the evidence to the jury as wholly uncontradicted. No reference was made to Nathan Spira or to his neglect to testify, and, as a matter of fact, the testi-

mony referred to was contradicted by no one. There was a general appeal to the jury to enforce the law, but as to that there was also no objection and no ruling. Wherever there was an objection it was sustained by the court or was groundless.

Instruction 20 given at the request of the People was as follows:

"The court instructs the jury that if you believe from the evidence, beyond a reasonable doubt, that the defendants, or any of them, willfully and maliciously burned the building of Albert Dickinson mentioned in the indictment, or willfully and maliciously caused it to be burned in manner and form as alleged in the said indictment, without the consent of the owner thereof, then the defendants, or such of them as to whom you have such belief, are guilty of arson, and you will find them or him guilty as charged."

The objections are, that it stated that the jury had a belief, and also if they believed any defendant burned the building, or caused it to be burned, they should convict all the defendants. The jury understood the instruction as it was intended, and found one defendant guilty and the other not guilty.

Instructions 22 and 24 were on the subject of malice, and were correct. Instruction 25 is objected to as assuming that the defendants committed the crime charged in the indictment. The instruction was as follows:

"The court instructs the jury that if you find from the evidence in this case, beyond a reasonable doubt, that the defendants Benzoin Spira and Nathan Spira, and Ben Fink, prior to the commission of the crime charged herein, entered into a criminal conspiracy for the purpose of burning the property of Albert Dickinson, as alleged in the indictment, and if you further find from the evidence, beyond a reasonable doubt, that pursuant to such conspiracy and in furtherance thereof Ben Fink did burn the property of Albert Dickinson, as alleged in the indictment, then the act

of Ben Fink was the act of all of the persons who joined the conspiracy, and all persons so participating in such conspiracy are guilty of arson."

The fact that a crime was committed was proved beyond any manner of doubt by evidence which there was neither fact, circumstance nor testimony to contradict. The instruction did not assume that the defendants, or either of them, committed the crime but required proof of guilt beyond reasonable doubt. There is no other objection to instructions worthy of attention.

Finally, it is urged that there was a variance between the indictment and the evidence, in the fact that the indictment charged the building was the property of Albert Dickinson and the evidence showed that it was the property of the lessee. We considered and settled that question in *People* v. *Covitz,* 262 Ill. 514, by holding that it is sufficient, if a building is occupied, to allege that it is the property of the owner, the lessee or the occupant.

The judgment is affirmed.    *Judgment affirmed.*